# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **PFIZER INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. N18C-01-310 PRW CCLD** |
| | ) | |
| **ARCH INSURANCE COMPANY** | ) | |
| **AND U.S. SPECIALTY INSURANCE** | ) | |
| **COMPANY,** | ) | |
| **Defendants.** | ) | |

Submitted: April 1, 2019
Decided: July 23, 2019

*Upon Plaintiff's Motion for Partial Summary Judgment,*
**GRANTED.**

*Upon Defendants' Motion for Partial Summary Judgment,*
**DENIED.**

## MEMORANDUM OPINION AND ORDER

John P. Ditomo, Esquire, Kenneth J. Nachbar, Esquire, Barnaby Grzaslewicz, Esquire, Morris, Nichols, Arst & Tunnell LLP, Wilmington, Delaware, Adam S. Ziffer, Esquire (argued) (*pro hac vice*), McKool Smith, P.C., New York, New York, Attorneys for Plaintiff.

Marc S, Casarino, Esquire, White & Williams, Wilmington, Delaware, Erica J. Kerstein, Esquire (argued) (*pro hac vice*), White & Williams, New York, New York, Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware, Matthew J. Dendinger, Esquire (*pro hac vice*), Loss, Judge & Ward, LLP, Washington, District of Columbia, Attorneys for Defendants.

**WALLACE, J.**

## I. INTRODUCTION

This is an insurance coverage dispute in which Pfizer Inc. ("Pfizer") brings a cause of action for declaratory relief and damages against Arch Insurance Company ("Arch") and U.S. Specialty Insurance Company ("U.S. Specialty," and together with Arch, the "Defendant Insurers"), asserting claims for breach of contract and/or anticipatory breach and repudiation of contract against Defendant Insurers in connection with certain excess directors' and officers' insurance policies (the "D&O Policies") the Defendant Insurers sold to Pfizer.[1] Pfizer asserts that the D&O Policies obligate the Defendant Insurers to pay for the costs incurred by Pfizer in connection with the defense and settlement of the action captioned *Philip Morabito, et. al v. Pfizer, Inc., and Henry A. McKinnel [sic]*, No. 1:04-civ-9967 (LTS) (HBP) (S.D.N.Y.) (the "*Morabito* Action").[2]

Both sides have moved for summary judgment,[3] asking the Court to decide whether coverage for the *Morabito* Action is expressly precluded by the terms of the

---

[1] Pl.'s Compl. ¶ 1 (Jan. 26, 2018) (D.I. 1).

[2] *Id.* That action was later consolidated and captioned *In Re Pfizer Inc. Securities Litigation*, No. 1:04-civ-9866 (HBP) (S.D.N.Y).

[3] Defendant Insurers initially filed a motion under Del. Super. Ct. R. 12(b)(6) to dismiss Pfizer's Amended Complaint. (D.I. 57). Pfizer countered with a motion for partial summary judgment. (D.I. 70). The Court heard the two motions together and, at oral argument (with the parties' acquiescence), converted Defendant Insurers' motion to dismiss to a cross-motion for summary judgment. *See* Transcript of Oral Argument at 58-59, *Pfizer Inc. v. Arch Specialty Ins. Co.*, N18C-01-310 PRW CCLD (D.I. 82).

-1-

D&O Policies. Arch and U.S. Specialty argue that the *Morabito* Action is either: (a) a Claim[4] "arising out of, based upon or attributable to," *Robert L. Garber v. Pharmacia Corp., et. al.*, No.03-1519 (AET) (D.N.J.)[5] (the "*Garber* Action," and together with the *Morabito* Action, the "Underlying Actions"); or (b) a Claim that shares "as a common nexus any fact, circumstance, situation, event, transaction [or] cause" with the *Garber* Action such that the D&O Policies' exclusions preclude coverage.[6] Pfizer contends that while the two Underlying Actions involve securities claims concerning the drug Celebrex, they are unrelated for purposes of the D&O Policies because they implicate "different plaintiffs, different defendants, different alleged harms, and different alleged wrongful conduct committed by different people."[7]

---

[4]     Capitalized terms are defined in the D&O Policies.

[5]     This case was later consolidated and captioned *Alaska Electrical Pension Fund, et. al. v. Pharmacia Corp. et al.*, No. 03-1519 (AET) (D.N.J.).

[6]     Defs.' Mem. In Support of its Mot. to Dismiss Pl.'s Am. Compl. at 9 (Aug. 7, 2018) (D.I. 58) [hereinafter "Defs.' Mem."].

[7]     Pl. Answering Br. In Opp'n to Defs.' Mot. to Dismiss Am. Compl. at 5 (Sept. 14, 2018) (D.I. 64) [hereinafter "Pl.'s Opp'n"].

## II. FACTUAL BACKGROUND[8]

### A. THE PARTIES AND THE D&O POLICIES.

Pfizer is a Delaware corporation with its principal place of business in New York and is one of the world's largest pharmaceutical companies.[9] Arch is a Missouri corporation with its principal place of business in New Jersey.[10] U.S. Specialty is a Texas corporation with its principal place of business in Texas.[11] Each of the Defendant Insurers has conducted substantial business in Delaware, including the business of selling insurance, investigating claims and/or issuing policies that cover policyholders or activities in Delaware.[12]

As part of its business, Pfizer annually purchased D&O insurance to insure against third-party claims alleging wrongful conduct on the part of Pfizer's directors and officers.[13] For the period in effect from April 16, 2004, to April 16, 2005 (the "Relevant Period"), Pfizer had thirteen layers of D&O insurance providing $225

---

[8]   The Court takes the following facts from the parties' motions, declarations, and the exhibits attached thereto. The Court also cites the complaints in the Underlying Actions, which have been attached as exhibits and the contents of which are not disputed by either party. Del. Super. Ct. Civ. R. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[9]   Pl.'s Compl. ¶¶ 6, 12.

[10]   *Id.* ¶ 7.

[11]   *Id.* ¶ 8.

[12]   *Id.* ¶¶ 7, 8.

[13]   *Id.* ¶ 13.

million in coverage, all in excess of a $10 million self-insured retention.[14] With certain exceptions, the thirteen excess policies in effect during the Relevant Period "follow form" to the policy issued by Pfizer's primary carrier, National Union Fire Insurance Co. of Pittsburgh, Pa. (the "National Union Policy").[15] National Union and each of the insurers who sold the various layers of excess policies to Pfizer (other than the Defendant Insurers) either paid Pfizer the limits of their policies or entered into settlement agreements with Pfizer for their *Morabito* Action coverage obligations.[16] Defendant Insurers have refused to pay or have disputed their obligations to pay any amounts under the D&O Policies in connection with the *Morabito* Action.[17]

The National Union Policy provides coverage to Pfizer for both: (1) Pfizer's own Loss arising from a Securities Claim made against Pfizer for any Wrongful Act of Pfizer; and (2) Pfizer's Loss arising from indemnifying an Insured Person, including a director, officer or employee of Pfizer, for a Claim made against the

---

[14]     *Id.* ¶ 14.

[15]     *Id.* ¶ 15.

[16]     *Id.* ¶ 16.

[17]     *Id.* ¶ 17. The Arch policy (No. 11DOX0175701) is the fourth layer in the insurance coverage tower with limits of $10 million excess of $75 million. The U.S. Specialty policy (No. 24-MGU-04-A3813) is the eighth layer in the insurance coverage tower with limits of a $15 million part of $25 million excess of $130 million. *Id.*

Insured Person for any Wrongful Act of such Insured Person.[18] Under the National Union Policy, "Claim" includes, among other things, a civil proceeding for monetary relief and "Securities Claim" includes a lawsuit alleging violation of any federal statute regulating securities.[19] The National Union Policy further defines "Loss" to include "damages, settlements, judgments . . . [and] Defense Costs," and "Wrongful Act" to mean "any actual or alleged breach of duty, neglect, error, misstatement misleading statement, omission or act[.]"[20]

The National Union Policy also contains two exclusions that Defendant Insurers have raised in this dispute as bases for failing to pay under the D&O Policies.[21] Exclusion 4(d) excludes Loss in connection with Claims made against an Insured "alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time" (the "Related Wrongful Acts Exclusion").[22] In addition, the National Union

---

18      *Id.* ¶ 18.

19      *Id.* ¶ 19.

20      *Id.*

21      *Id.* ¶ 21.

22      *Id.*

Policy's Endorsement No. 18 provides that the insurer will not be liable for any "Loss in connection with any Claim(s) alleging, arising out of, based upon, attributable to or in any way related directly or indirectly . . . to a related Breach of Fiduciary Duty or a related Wrongful Action alleged" in a lawsuit entitled "*Robert L. Garber v. Pharmacia*" (the "Specific Litigation Exclusion").[23] Each of the Defendant Insurers' D&O Policies contains exclusions that are similar to the Related Wrongful Acts Exclusion and the Specific Litigation Exclusion.[24] But neither of the D&O Policies appear to have an effective choice-of-law provision.

## B. THE *MORABITO* ACTION.

The *Morabito* Action was initiated on or about December 17, 2004, by lead plaintiff Philip Morabito against Pfizer and Henry A. McKinnell, then Pfizer's Chairman of the Board and CEO, on behalf of those who purchased Pfizer's common stock between November 1, 2000, and December 16, 2004 (the "Class Period").[25] The *Morabito* Action alleged two claims under the Securities and Exchange Act of 1934 (the "1934 Act"): violations of Section 10(b) and Section 20(a) of the 1934 Act and the rules promulgated thereunder.[26] On or about March 27, 2012, an amended

---

[23]     *Id.*

[24]     For ease of reference, the Court will use the term "Specific Litigation Exclusion" in discussing the exclusions pertaining to the *Garber* Action in each of the D&O Policies.

[25]     *Id.* ¶ 25.

[26]     *Id.*

complaint was filed in the *Morabito* Action that revised the causes of action, named four additional individual defendants (who were directors, officers, and employees of Pfizer), and amended the Class Period to October 31, 2000, through October 19, 2005.[27] The amended complaint in the *Morabito* Action alleged that Pfizer and the individual defendants made false representations and omissions regarding the cardiovascular risks associated with two of Pfizer's drugs—Celebrex and Bextra.[28]

On December 21, 2016, the federal district court granted final approval of a settlement of the *Morabito* Action in which Pfizer agreed to pay $486 million on behalf of itself and the individual defendants.[29] In addition to the settlement award, Pfizer, on behalf of all defendants, incurred more than $82 million in defense costs from the *Morabito* Action.[30]

Defendant Insurers have denied coverage for the *Morabito* Action, claiming that coverage is barred by the National Union Policy's Related Wrongful Acts Exclusion, the Specific Litigation Exclusion and similar endorsements in the Arch and U.S. Specialty D&O Policies because the *Morabito* Action is allegedly related to four prior lawsuits: (i) the *Garber* Action; (ii) *Cain v. Merck & Co., et. al.*, No.

---

[27]    *Id.* ¶¶ 26, 27.

[28]    *Id.* ¶ 28.

[29]    *Id.* ¶ 30.

[30]    *Id.* ¶ 31.

1:01-CV-03441 (E.D.N.Y. filed May 29, 2000) ("*Cain*"); (iii) *Leonard v. Pharmacia Corp. et. al.*, No. 3:01-CV-04104 (D.N.J. filed Aug. 27, 2001) ("*Leonard*"); and (iv) *Astin v. Pharmacia Corp. et. al.*, No. L-1322-01 (N.J. Super. Ct. Law Div. filed Aug. 27, 2001) ("*Astin*").[31]

*Garber* was a securities fraud class action lawsuit brought by shareholders of Pharmacia Corporation ("Pharmacia") who purportedly incurred financial losses as a result of false and misleading statements contained in a study commissioned by Pharmacia regarding Celebrex's gastrointestinal health risks.[32] Pfizer acquired Pharmacia in April 2003.[33] *Cain, Leonard* and *Astin* were consumer class action lawsuits brought on behalf of individuals who allegedly suffered physical injuries from consuming Celebrex and/or Vioxx.[34] Although Pfizer cites each of *Cain, Leonard* and *Astin* in its Amended Complaint, Defendant Insurers identify *Garber* only as a trigger of the Specific Litigation Exclusion.

By way of high level comparison, both the *Morabito* Action and the *Garber* action are securities fraud class actions alleging violations of Sections 10(b) and 20(a) of the 1934 Act (and the rules promulgated thereunder). The *Morabito* Action

---

[31]    *Id.* ¶ 35.

[32]    *Id.* ¶ 36.

[33]    *Id.*

[34]    *Id.*

- 8 -

was brought by the stockholders of Pfizer, whereas the *Garber* Action was brought by the stockholders of Pharmacia (prior to being acquired by Pfizer). The *Morabito* Action alleged that Pfizer and the individual defendants made false representations and omissions regarding the **cardiovascular risks** associated with Celebrex and Bextra, whereas the *Garber* Action alleged that Pharmacia and its co-marketer Pfizer made false and misleading statements regarding the **gastrointestinal health risks** of Celebrex. Notably, the amended complaint in the *Garber* Action is 37 pages, whereas the amended complaint in the *Morabito* Action is 218 pages.

## III. LEGAL STANDARD

The Court may grant a motion for summary judgment when: "(1) the record establishes that, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and (2) in light of the relevant law and those facts, the moving party is legally entitled to judgment."[35] The Court may not grant a motion for summary judgment "[i]f . . . the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record . . . ."[36] "However, a matter

---

[35] *Haft v. Haft*, 671 A.2d 413, 414–15 (Del. Ch. 1995) (citing *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991)). *See also Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. 1996) ("If the Court finds that no genuine issues of material fact exist, and the moving party has demonstrated his entitlement to judgment as a matter of law, then summary judgment is appropriate.").

[36] *CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015).

should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary."[37]

The well-established standards and rules for summary judgment apply in full when the parties have filed cross-motions for summary judgment. But, where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[38] So, "the questions before this Court are questions of law not of fact, and the parties by filing cross motions for summary judgement have in effect stipulated that the issue[] raised by the motions [is] ripe for a decision on the merits."[39]

Pfizer, Arch, and U.S. Specialty all agree that their motions present a purely legal question for the Court to decide: do the D&O Policies' exclusions preclude coverage for the *Morabito* Action?[40] Each party agrees too that the Court can

---

[37]    *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999).

[38]    Del. Super. Ct. Civ. R. 56(h).

[39]    *Health Corp. v. Clarendon Nat. Ins. Co*, 2009 WL 2215126, at *11 (Del. Super. Ct. July 15, 2009).

[40]    Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. at 1 (Nov. 27, 2018) (D.I. 73) [hereinafter "Defs.' Opp'n"]; Pl.' Mem. at 3; *See Valley Forge Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2012 WL 1432524, at *6 (Del. Super. Ct. Mar. 15, 2012) ("When no factual dispute remains, summary judgment is particularly appropriate in matters of insurance contract interpretation because interpretation of an insurance policy is a question of law for the court.").

determine whether the D&O Policies' exclusions apply as a matter of law based solely on the parties' motions, declarations, and the exhibits attached thereto.[41]

## IV. DISCUSSION

### A. THE PARTIES' CONTENTIONS.

Defendant Insurers posit that since the Underlying Actions contain overlapping and common allegations regarding Pfizer's and Pharmacia's fraudulent misrepresentations and omissions concerning the safety of Celebrex, the two actions are unquestionably related.[42] And, Defendant Insurers highlight seven main similarities when comparing the Underlying Actions' complaints; they say both:

> (1) are predicated upon allegations that Pfizer and Pharmacia made material misrepresentations and omissions with respect to the safety and efficacy of COX-2 inhibitors, including Celebrex;
>
> (2) allege that Pfizer and Pharmacia made material misstatements and omissions to the public regarding the results of the CLASS Study in order to create the false impression that Pharmacia's and Pfizer's COX-2 inhibitors were safer and more effective than other NSAIDs;
>
> (3) refer to the same articles and publications in support of their allegations regarding the misrepresentations;
>
> (4) allege that the material misrepresentations and omissions were made over a common time period;

---

[41]     Defs.' Mem. at 4; Pl.'s Mem. at 3; Transcript of Oral Argument at 58-59, *Pfizer Inc. v. Arch Specialty Ins. Co.*, N18C-01-310 PRW CCLD (D.I. 82).

[42]     Defs.' Opp'n. at 2-3.

(5) allege that, in June 2002, articles were published that ultimately revealed the actual results of the CLASS study, and disclosed that Pfizer's and Pharmacia's COX-2 inhibitors had no safety advantage whatsoever over other NSAIDs;

(6) allege that the stock price of the respective companies dropped once the truth was revealed; and

(7) are securities fraud class actions, alleging counts for (a) violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, and (b) violation of Section 20(a) of the 1934 Act.[43]

Thus, the Defendant Insurers contend that coverage is precluded by the D&O Polices' express terms.

But Pfizer says that the Underlying Actions are unrelated for purposes of the D&O Policies because they "involved different shareholder plaintiffs, different alleged wrongful conduct, committed by different corporate and individual defendants, and different alleged harm to different company stock initiated by different revelations to the market at different times of different health risks of different drugs."[44]

## B. RELEVANT POLICY PROVISIONS.

At issue is the applicability of the Specific Litigation Exclusion.

---

[43]    Defs.' Mem. at 19-20.

[44]    Pl.'s Mem. at 2-3.

The Arch D&O Policy provides:

(1) The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** arising out of, based upon or attributable to:

    a. the following: Garber v. Pharmacia; or

    b. any **Wrongful Act** alleged in such litigation or proceeding, or any other **Wrongful Act** whenever occurring, which, together with any **Wrongful Act** alleged in such litigation or proceeding, constitute **Interrelated Wrongful Acts**.

(2) **"Wrongful Act"** means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

(3) **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.[45]

Similarly, the National Union Policy provides:

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with: (i) any **Claim(s)**, notices, events, investigations or actions referred to in any of items (1) through (--) below; (hereinafter **"Events"**); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Breach of Fiduciary Duty**, **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly, to any **Event(s)**:

    (1) Robert L. Garber v. Pharmacia (hereinafter the **"Events"**)

---

[45] Pl.'s Compl., Ex. D, Endorsement No. 5.

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to a related **Breach of Fiduciary Duty** or related **Wrongful Act** alleged in any of the items (1) – (__) above, regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action, or the same or different claimants, or is brought in the same or different venue, or resolved in the same or different forum.[46]

## C. CHOICE OF LAW.

There are three steps to take when engaging Delaware's choice-of-law analysis: first, determine if the parties made an effective choice of law through their contract; second, if not, determine if there is an actual conflict between the laws of the different states each party believes should apply; and, third, if there is an actual

---

[46] Pl.'s Compl., Ex. A, Endorsement No. 18. The National Union Policy's Specific Litigation Exclusion applies to U.S. Specialty as well since the U.S. Specialty Policy "follows form" to the immediately underlying policy issued by Twin City Fire Insurance Company, which in turn, "follows form" to the National Union Policy. *See Id.*, Ex. B, §I ("Except as specifically set forth in the terms, conditions or endorsements of this Policy, coverage hereunder shall apply in conformance with the terms, conditions, limitations and endorsements of the policy immediately underlying this Policy, except that coverage hereunder shall attach only after all Underlying Insurance has been exhausted by actual payment of claims or losses thereunder."). The parties agree that the Specific Litigation Exclusion in the National Union Policy is functionally the same as the Specific Litigation Exclusion in the Arch D&O Policy. Pl.'s Mem. at 33; Defs.' Reply Br. for Mot. to Dismiss at 14; Defs.' Mem. at 3 n. 5. ("Insurers do not dispute that the two Specific Litigation Exclusions for the *Garber* litigation are 'substantially the same[,]' and should lead to the same result 'for all the same reasons.'"). Therefore, the Court will focus on analyzing the language in the Arch D&O Policy as the parties' have urged in their briefing.

conflict, employ the "most significant relationship test" to determine which state's law applies.[47]

Since none of the D&O Policies contain an express choice-of-law provision,[48] the Court must first consider whether an actual conflict exists. "Delaware courts recognize that, where possible, a court should avoid a choice-of-law analysis altogether if the result would be the same under the law of either of the competing jurisdictions."[49] Although the parties suggest that the outcome of the motions should be the same regardless of which law applies,[50] there seems to be a significant

---

[47]     *Travelers Indem. Co. v. CNH Indus. Am., LLC,* 2018 WL 3434562, at \*3 (Del. 2018) (citing *Certain Underwriters at Lloyds, London v. Chemtura Corp.,* 160 A.3d 457, 464 (Del. 2017)).

[48]     Pfizer contends "[t]hat there is a choice-of-law provision in the Excess Policies, incorporated from the underlying National Union Policy, which provides that the law of the state of Pfizer's incorporation – Delaware – applies to the terms of the Excess Policies with respect to arbitration." Pl.'s Opp'n at 19-20. The Court does not interpret the reference to Delaware law in connection with arbitration or mediation as an express choice-of-law provision. The Court will explain how this reference, instead, might reveal the parties' expectations of which law should apply when engaging the "most significant relationship" test.

[49]     *IDT Corp. v. U.S. Specialty Ins. Co.,* 2019 WL 4784432 at \*6 (Del. Super. Ct. Jan. 31, 2019). *See also Laugelle v. Bell Helicopter Textron, Inc.,* 2013 WL 5460164, at \*2 (Del. Super. Ct. Oct. 1, 2013) ("[I]t must be first determined that there is an actual—rather than no or merely a 'false'—conflict. If there is no actual conflict, 'the Court should avoid the choice-of-law analysis altogether.'").

[50]     Pl.' Mem. In Support of its Mot. for Partial Summ. J. at 15 (Nov. 5, 2018) (D.I. 71) [hereinafter "Pl.'s Mem."] ("[W]hile the Insurers suggest that New York law should apply, they agree that 'there is no material conflict between New York and Delaware law regarding interpretation and enforcement of the Arch Policy's Specific Litigation Exclusion.'"); Defs.' Opp'n at 12 ("The parties agree that this Court need not make a choice-of-law determination at this juncture because, regardless of whether New York or Delaware law applies, the outcome should be the same.").

- 15 -

difference between the laws of Delaware and New York with respect to the reasonable interpretation of the Specific Litigation Exclusion in this coverage dispute.

Both states place the burden on an insurer to prove that a policy exclusion applies.[51] And each adopts a "plain reading approach to examine unambiguous policy language."[52] But the two differ with respect to the reasonable interpretation of the type of "related" or "interrelated" exclusion at issue in this case.

Under New York law:

> To establish that a prior Claim is interrelated with a subsequent Claim, the Claims must share a "sufficient factual nexus." A sufficient factual nexus exists where the Claims are neither factually nor legally distinct, but instead arise from common facts and where the logically connected facts and circumstances demonstrate a factual nexus among the Claims. To demonstrate a sufficient factual nexus, the claims need not involve precisely the same parties, legal theories, Wrongful Acts, or requested relief. Where the policy's language refers to "any" fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes, it is immaterial that one claim may involve additional facts or allegations

---

[51] *See, e.g., United Westlabs, Inc. v. Greenwich Ins. Co.*, 2011 WL 2623932, at *8 (Del. Super. Ct. June 13, 2011), *aff'd*, 38 A.3d 1255 (Del. 2012) ("Where the insured has shown that a claim is covered by an insurance policy, the burden shifts to the insurer to prove that the event is excluded under the policy."); *Zunenshine v. Exec. Risk Indem., Inc.*, 1998 WL 483475, at *4 (S.D.N.Y. Aug. 17, 1998), *aff'd*, 182 F.3d 902 (2d Cir. 1999) ("[T]he insurer bears the burden of proving that the policy's exclusions "clearly and unmistakably" apply to the insured's claims.").

[52] *TIAA-CREF Individual & Institutional Servs., LLC v. Illinois Nat'l Ins. Co.*, 2016 WL 6534271, at *13 (Del. Super. Ct.), *appeal refused*, 151 A.3d 899 (Del. 2016).

- 16 -

because all that is required is "any" common fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.[53]

Conversely, under Delaware law, similar "relatedness" or "arising out of" policy language is interpreted as precluding coverage only where two underlying actions are "fundamentally identical."[54]

As such, the Court must employ the "most significant relationship" test to determine which state's law applies. Pfizer makes the case that Delaware law should apply because Pfizer is incorporated in Delaware and the parties selected Delaware law with respect to any arbitration or mediation arising out of disputes concerning the D&O Policies.[55] Arch and U.S. Specialty assert that New York has the most significant relationship to the contracting parties and the dispute because: (a) Pfizer's principal place of business is in New York; (b) the D&O Policies were issued in New York; (c) Pfizer's broker is located in New York; (d) the D&O Policies

---

[53]   *Weaver v. Axis Surplus Ins. Co.*, 2014 WL 5500667, at *12 (E.D.N.Y Oct. 30, 2014) (internal quotations and citations omitted), *aff'd,* 639 Fed. App'x 764 (2d Cir. 2016). Defendants contend that the *Weaver* decision is consistent with a long line of cases applying New York law that construe interrelated claim provisions by their express terms. *See generally Zahler v. Twin City Fire Ins. Co.*, 2006 WL 846352 (S.D.N.Y. Mar. 31, 2006); *Seneca Ins. Co. v. Kemper Ins. Co.*, 2004 WL 1145830 (S.D.N.Y. May 21, 2004), *aff'd,* 133 Fed. App'x 770 (2d Cir. 2005); *Zunenshine,* 1998 WL 483475.

[54]   *Med. Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879, at *14 (Del. Super. Ct. Sept. 29, 2016); *United Westlabs, Inc.*, 2011 WL 2623932, at *11-12.

[55]   Pl.'s Mem. at 17.

contained numerous New York amendatory endorsements; and (e) the *Morabito* Action was instituted in New York.[56]

There are "three layers of guidance" underlying the *Second Restatement*'s "most significant relationship" test in the insurance context: first, looking to the site-of-the-risk presumption in §193; then, weighing the five factors set out in §188; and, lastly, considering the §188 factors in light of the policy interests in §6.[57] For "contract disputes more broadly"[58] and a "complex, multistate insurance program"[59] more specifically, the actual site of the risk is less important and the Court should instead focus on weighing the following factors: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.[60] Nevertheless, protecting the

---

[56]    Defs.' Mem. at 3, 16.

[57]    *Travelers Indem. Co.*, 2018 WL 3434562, at \*3-5 (citing *Chemtura Corp.*, 160 A.3d at 464-65).

[58]    *Chemtura Corp.*, 160 A.3d at 465.

[59]    *Id.* at 466.

[60]    *Id.* at 464-65 (citing Restatement (Second) Conflict of Laws §188(2)). *See also* Restatement (Second) Conflict of Laws §193 cmt. b ("[Situations] where the location of the risk has less significance, include (1) where the insured object will be more or less constantly on the move from state to state during the term of the policy and (2) where the policy covers a group of risks that are scattered throughout two or more states.").

parties' "justified expectations"[61] and ensuring "certainty, predictability and uniformity of result"[62] are of the utmost importance.

Despite the fact that some of the §188 factors tip in favor of New York,[63] application of Delaware law is most consistent with the parties' reasonable expectations at the time of contracting and with this Court's accepted choice-of-law analysis for directors' and officers' insurance policies. Delaware law is the sole law expressly contemplated in any of the D&O Policies' items. And the way Delaware law is included therein is particularly illuminating. Referring to a certain state's law in an alternate dispute resolution provision suggests "that the parties probably expected" that state's law to apply.[64] Here, just as in *Mills*, under these D&O Policies "all disputes or differences which may arise under or in connection with this policy . . . shall be submitted to the alternative dispute resolution ("ADR") process set forth in this provision."[65] That provision described the requirements and

---

[61]     *Chemtura Corp.*, 160 A.3d at 468 (quoting Restatement (Second) Conflict of Laws §6(2)).

[62]     *Travelers Indem. Co.*, 2018 WL 3434562, at *13 (quoting Restatement (Second) Conflict of Laws at §193(2)(e)).

[63]     Pl.'s Compl. ¶ 6 (noting that Pfizer's principal place of business is in New York); Pl. Compl., Ex. A and B Declarations (suggesting that the D&O Policies were issued in New York through Marsh USA, Inc., whose business address is also in New York).

[64]     *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at *4 (Del. Super. Ct. Nov. 5, 2010).

[65]     Pl.'s Compl., Ex. A §17.

expectations for the mediation or arbitration process:

> [T]he mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator or arbitrators shall also give due consideration to the general principles of the law of the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy.[66]

Defendant Insurers contend that "[o]nce Pfizer terminated the mediation and filed suit, this provision ceased having any bearing on the resolution of the coverage dispute."[67] Not so. Adopting their read would lead one to interpret the D&O Policies' meaning under Delaware law for purposes of mediation, but likely a different state's law in any resulting litigation. That's the precise kind of uncertainty and inconsistency that the *Second Restatement* counsels to avoid.

As well, applying Delaware law here accords with this Court's consistent application of Delaware law to resolve disputes over insurance coverage of directors' and officers' liability.[68] Where D&O coverage is at issue "and the choice

---

[66] *Id. Compare Mills Ltd. P'ship*, 2010 WL 8250837, at *4 ("The primary insurance policy, which Liberty Mutual followed, provided that 'all disputes or differences which may arise under or in connection with this policy . . . shall be submitted to the alternate dispute resolution process ("ADR") set forth in this clause.' ADR may be commenced in Georgia, Illinois, New York, Colorado, or Virginia, but 'arbitrators shall . . . give due consideration to the general principles of the law of the state' where Plaintiffs are incorporated.").

[67] Defs.' Suppl. Submission on Choice of Law at 3-4 (Mar. 22, 2019) (D.I. 79) [hereinafter "Defs.' Suppl."].

[68] *IDT Corp.*, 2019 WL 4784432, at *6-7. *See also Arch Ins. Co. v. Murdock*, 2018 WL 1129110, at *9 (Del. Super. Ct. Mar. 1, 2018), *appeal refused sub nom. Navigators Ins. Co. v. Murdock*, 183 A.3d 1281 (Del. 2018) ("In complex insurance cases with risks in multiple states

- 20 -

of law is between the headquarters or the state of incorporation, the state of incorporation has the most significant relationship."[69] Defendant Insurers question whether the Underlying Actions implicate the "directors' and officers' 'honesty and fidelity' to the corporation"[70] such that deference should be afforded to the state of incorporation as the state with the most significant relationship.[71] They say it is enough that the *Morabito* Action is a securities class action governed by federal law and litigated in New York federal court.[72] But, "when applying the *Second Restatement* factors to a corporate-wide insurance program, the inquiry should center on the insurance contracts and not the underlying claims."[73]

## D. DELAWARE CONTRACT INTERPRETATION.

Proper construction of insurance policies depends largely on the type of policy provision at issue. "Coverage language is interpreted broadly to protect the insured's

---

such as this one, Delaware courts have generally held that the most significant factor for the conflict-of-law analysis is the principal place of business of the insured because it is the situs which links all the parties together. However, when the risk is the directors' and officers' honesty and fidelity to the corporation, and the choice of law is between the headquarters or the state of incorporation, the state of incorporation has the most significant relationship.") (internal citations omitted); *Mills Ltd. P'ship*, 2010 WL 8250837, at *6 ("When the conduct of a corporation's directors and officers is centrally implicated, the place of incorporation is important.").

[69]     *Arch Ins. Co.*, 2018 WL 1129110, at *9.

[70]     *IDT Corp.*, 2019 WL 4784432, at *6 (quoting *Mills Ltd. P'ship*, 2010 WL 8250837, at *6).

[71]     Defs.' Suppl. at 9.

[72]     *Id.*

[73]     *Travelers Indem. Co.*, 2018 WL 3434562, at *1.

objectively reasonable expectations. Exclusionary clauses, on the other hand, are 'accorded a strict and narrow construction.' . . . [C]ourts will give effect to exclusionary language where it is found to be 'specific,' 'clear,' 'plain,' 'conspicuous,' and 'not contrary to public policy.'"[74]

When the language of an insurance policy is "clear and unambiguous," Delaware courts will honor the parties' intent by according its provisions their "ordinary and usual meaning."[75] The fact that parties disagree on the meaning of any given provision does not in-and-of-itself render that provision ambiguous.[76] Rather, ambiguity exists only when the controverted provision is "reasonably or fairly susceptible to different reasonable interpretations."[77] Under the time-honored doctrine of *contra proferentem*, any ambiguous policy language must be construed most strongly against the drafting insurance company.[78]

---

[74]     *Med. Depot, Inc.*, 2016 WL 5539879, at *7 (quoting *AT&T Corp. v. Clarendon Am. Ins. Co.*, 2006 WL 1382268, at *9 (Del. Super. Ct. April 25, 2006), *rev'd in part on other grounds, AT&T Corp. v. Fraday Capital Ltd.*, 918 A.2d 1104 (Del. 2007)).

[75]     *Id.* (quoting *Faraday Capital Ltd.*, 918 A.2d at 1108).

[76]     *Faraday Capital Ltd.*, 918 A.2d at 1108.

[77]     *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1062 (Del. 2010).

[78]     *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) ("We have held that where an ambiguity does exist, the doctrine of *contra proferentem* requires that the language of an insurance policy be construed most strongly against the insurance company that drafted it."); *Steigler v. Insurance Co. of N. Am.*, 384 A.2d 398, 400-01 (Del. 1978); *Continental Ins. Co. v. Rosenberg*, 74 A. 1073, 1076 (Del. 1909).

The exclusions at issue in this case are triggered by a claim "arising out of, based upon or attributable to" *either* the *Garber* Action itself *or* any Wrongful Act or Interrelated Wrongful Acts alleged in the *Garber* Action.[79] The parties differ notably on the reasonable interpretation of the "arising out of" language. Defendant Insurers cite the definition of "Interrelated Wrongful Acts," which "means Wrongful Acts that have as a common nexus <u>any</u> fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."[80] Defendant Insurers emphasize the use of "any" and encourage the Court to read the exclusion as precluding coverage so long as the Underlying Actions "share 'any' commonality[.]"[81] This reading is strained, uncharacteristically broad, and runs afoul of this Court's prior interpretation standards set forth in previous cases. In evaluating the meaning of similar "arising

---

[79]     Pl.'s Compl., Ex. D., Endorsement No. 5.

[80]     *Id.* (emphasis added).

[81]     Defs.' Opp'n at 17. Pfizer contends, and the Court agrees, that "the more [ ] reasonable interpretation of the [Specific Litigation] Exclusion is that it would only preclude coverage for any further litigation arising out of or sharing a common nexus with *Garber*—that is, further D&O litigation attributable to alleged misrepresentations regarding the 'GI side effects' of Celebrex. No reasonable insured would expect that an [e]xclusion based on a multi-million-dollar lawsuit alleging that Pharmacia executives misled the GI side effects of Celebrex affecting Pharmacia stock price would preclude coverage for an unrelated, multibillion-dollar lawsuit alleging that Celebrex and Bextra '*may increase the chance of a heart attack or stroke that can lead to death*,' negatively affecting Pfizer stock price." Pl.'s Mem. at 31. This instinctive read of the Specific Litigation Exclusion is likely why the other insurers on the coverage tower have either paid the full limits of their respective policies for the *Morabito* Action or entered into settlements with Pfizer regarding coverage for the *Morabito* Action. Pl.'s Compl. ¶ 33.

out of" and "interrelated" language—albeit in the context of deemer clauses—this Court has found coverage to be precluded only where the two underlying claims are "fundamentally identical."[82]

An indistinguishable definition of "Interrelated Wrongful Acts" was examined in *United Westlabs, Inc. v. Greenwich Ins. Co.* In *Westlabs*, plaintiffs ("UWL") sought insurance coverage for the liability and expenses stemming from various disputes with Seacoast Laboratory Data Systems ("Seacoast") concerning the installation, license, and maintenance of UWL's billing and financial forecasting system.[83] UWL contracted with Seacoast for the SurroundLab AR billing system ("SLAR") and agreed to give select Seacoast programmers access to SLAR's file and data structures though a remote virtual private network ("VPN").[84] On two separate occasions—one occurring in early 2007 and the second occurring in late

---

[82] *Med. Depot, Inc.*, 2016 WL 5539879, at *14; *United Westlabs, Inc.*, 2011 WL 2623932, at *11-12. Defendant Insurers argue that the "fundamentally identical" standard is inappropriate here because it was only ever used in the context of "deemer clauses" and "these 'deemer clauses' are not the same as – and serve a different purpose than – the Specific Litigation Exclusion at issue here." Defs.' Opp'n at 23-24. Pfizer counters that Defendant Insurers fail to explain the "different purpose" and offers the following as an explanation of how "deemer clauses" and the Specific Litigation Exclusions serve the same purpose: "they 'deem' all 'related' claims to be a single claim at the time the first claim was made, for the purpose of excluding coverage or triggering the earliest policy period." Pl.'s Reply Mem. for its Mot. for Partial Summ. J. at 15 (Dec. 4, 2018) (D.I. 74). There being no good reason to deviate from this Court's prior holdings, the Court proceeds in applying the "fundamentally identical" standard.

[83] *United Westlabs, Inc.*, 2011 WL 2623932, at *1.

[84] *Id.*

- 24 -

2008—UWL deactivated Seacoast's VPN access to SLAR in response to allegations that UWL was in breach of the parties' agreement.[85] UWL's insurance policy defined "Interrelated Wrongful Acts" as: "Wrongful Acts which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events."[86] In evaluating whether the two instances should be treated as interrelated, this Court found the wrongful acts to be "fundamentally identical" because they involved the exact "same subject": "[i]n both instances UWL allegedly breached the SLAR Agreement by refusing to pay various fees and allegedly committed copyright infringement of a 'hacking' violation by deactivating Seacoast's access to the VPN."[87]

## E. *GARBER* AND *MARABITO* ARE NOT FUNDAMENTALLY IDENTICAL.

Although both are class action lawsuits alleging securities violations,[88] the *Garber* Action and *Morabito* Action do not cover the "same subject" and the Special Litigation Exclusion, therefore, does not preclude coverage. The *Garber* Action was brought by Pharmacia's shareholders seeking redress for fraudulent and misleading

---

[85]    *Id.* at 6-7.

[86]    *Id.* at 4.

[87]    *Id.* at 11.

[88]    Pl.'s Compl. ¶¶ 25, 36.

statements Pharmacia and its co-marketer Pfizer made regarding the gastrointestinal health risks of Celebrex; that wrongdoing lead to a loss of millions shortly after the truth was revealed on June 1, 2002.[89] Specifically, the *Garber* plaintiffs alleged that Pharmacia and Pfizer publically misrepresented the results of its CLASS Study to create the impression that Celebrex users "had fewer upper-GI toxic effects than those who took other traditional NSAIDs[]"[90] all-the-while knowing that "the CLASS Study as originally designed did *not* demonstrate a superior GI safety profile for Celebrex over traditional NSAIDs."[91] The *Morabito* plaintiffs, on the other hand, brought suit against Pfizer and some of its executives for false representations and omissions regarding the cardiovascular risks associated with Celebrex and another drug, Bextra.[92] Despite including the CLASS Study among the list of material information the defendants had access to,[93] the alleged market harm in the *Morabito* Action stemmed specifically from the defendants "repeatedly touting internal safety data which they claimed demonstrated cardiovascular safety" while they "were in possession of completed drug safety studies and other data and information which

---

[89]     *Id.* ¶ 36.

[90]     Defs.' Mem., App., at ¶ 4.

[91]     *Id.* at ¶ 5.

[92]     Pl.'s Compl. ¶ 28.

[93]     *Id.*, Ex. E, at ¶ 5.

documented the serious cardiovascular risks of Celebrex and/or Bextra."[94]  In short, while there may be some thematic similarities, the Underlying Actions are truly, in all relevant respects, different.

## V.    CONCLUSION

The wrongs alleged in the *Garber* and *Morabito* Actions involved entirely distinct misrepresentations of very different health risks associated with Celebrex. The Underlying Actions are not fundamentally identical.  And so, the Court must find, as a matter of law, that the Specific Litigation Exclusion in the D&O Policies does not excuse Defendant Insurers' coverage obligations.  Pfizer's Motion for Partial Summary Judgment is **GRANTED**, and Arch and U.S. Specialty's Cross-Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

---

[94]    *Id.* at ¶¶ 3, 4.